**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CRIMINAL ACTION NO. 18-37-DLB-CJS-2**

**UNITED STATES OF AMERICA**                                                    **PLAINTIFF**

**v.**                                    **MEMORANDUM OPINION AND ORDER**

**QUINTIN TYLER BRIAN DAVIS**                                                **DEFENDANT**

\* \* \* \* \* \* \* \* \* \* \* \* \*

This matter is before the Court upon Magistrate Judge Candace J. Smith's Report and Recommendation ("R&R") (Doc. # 95), wherein she recommends that Defendant Quintin Tyler Brian Davis's Motion to Suppress (Doc. # 67), be denied. Defendant having filed Objections to the R&R (Doc. # 99), and the Government having responded to the Defendant's Objections (Doc. # 101), the R&R is now ripe for the Court's for review. For the reasons set forth herein, Defendant's Objections are **sustained in part and overruled in part**, the R&R is **adopted in part and rejected in part**, and the Motion to Suppress is **denied in part and granted in part**.

## I.    FACTUAL BACKGROUND

On August 28, 2018, Cincinnati Police Officer Kowalski observed what he believed to be a hand-to-hand drug transaction involving a 2003 Cadillac CTS belonging to the Defendant. (Doc. # 95 at 3). Officer Kowalski testified that he saw a man "[run] up to the passenger side window [of the Cadillac] and reach[] into the passenger side window and then [stand] back up" before the Cadillac left the scene. (Doc. # 87 at 5:14–17). Based

on his years of experience as a police officer, Officer Kowalski believed he had witnessed a hand-to-hand drug transaction.  *Id.* at 6:3–10.  Around the same time, Cincinnati Police Officer Schaible received a phone call from a reliable confidential informant who told him that the Defendant "had just conducted a drug transaction in the same location that Officer Kowalski was at."  *Id.* at 18:2–3.  The informant's description of the alleged drug transaction matched Officer Kowalski's observations.  (Doc. # 95 at 3–4).

The following morning, Cincinnati police officers executed a traffic stop while Defendant was driving the 2003 Cadillac CTS.  (Doc. # 95 at 4).  Officers initiated the traffic stop because the windows of Defendant's vehicle were illegally tinted.  (Doc. # 87 at 51: 9–10).  After Defendant noticed two police cruisers following him, he quickly turned into a convenience store parking lot.  *Id.* at 4.  Officers Broering and Knapp pulled into the parking lot directly behind Defendant, exited their vehicles, and approached the Cadillac.  (Doc. # 87 at 53:6–54:5).  Officer Broering testified that he could not see into the car because of the heavily tinted windows, but that he "could see the silhouette of Defendant" and saw that Defendant was turned and looking down towards the center console area of the car.  (Doc. # 95 at 5).  Based on his years of experience as an officer, Officer Broering thought Defendant's position was "a typical thing that someone would do when they're trying to hide contraband."  (Doc. # 87 at 44:20–23).  Officer Schaible was also at the scene, and he testified that "he observed [Defendant's] silhouette through the front windshield of his vehicle and that [Defendant] was making furtive movements towards the center console."  (Doc. # 95 at 4–5).

At some point as he was approaching Defendant's car, Officer Broering had an unobstructed view into the vehicle.  (Doc. # 87 at 58:11–13).  He saw that "the cup holder

in the center console [of the car] had been filed with orange juice" and orange juice was spilled on the seats. (Doc. # 95 at 5). Officer Broering also saw a "small plastic bag inside the cup holder that contained orange juice, and another small plastic bag on the driver's side floor." *Id.* Additionally, Officer Clarkson saw a white powder substance on Defendant's hands. Government Exhibit 10. Defendant was ordered out of his car, arrested, and placed in a police cruiser. (Doc. # 95 at 5).

Following his arrest, the Defendant was taken to the Gang Unit of the Cincinnati Police Department on Warsaw Avenue. *Id.* at 6. Defendant was placed and handcuffed at a table in the booking area.[1] *Id.* At some point shortly after arriving at the police station, officers read Defendant his *Miranda* rights. *Id.* Defendant then told the officers that he was not interested in talking at approximately 10:30 a.m.[2] (Doc. # 87 at 81:19–23). Officer Stratmann left for approximately thirty minutes and continued to work on search warrants. (Doc. # 87 at 78:17–25). When Officer Stratmann returned, he saw the Defendant with his head on the table. *Id.* 79:1–4. Officer Stratmann was alarmed because falling asleep is "one of the symptoms of an overdose or an exposure" and he was concerned that Defendant may have been exposed to the drugs that were found in

---

[1]      There is conflicting testimony about who remained at the table with Defendant in the booking area. Officer Stratmann testified that when Defendant arrived at the station he was "left at the table with Trooper Hess and Officer Schaible" while he started "working on a search warrant." (Doc. # 87 at 78:2–3). Officer Schaible, however, testified that he began drafting a search warrant during the same time. *Id.* at 22:16–18.

[2]      While neither party disputes that Defendant invoked his right to silence around 10:30 a.m., the timeline of events is unclear, and there is conflicting testimony as to what Defendant exactly said. Officer Stratmann initially testified that "one of the first times" that he saw the Defendant after arriving at the station, Defendant told him that he "didn't have anything to say." *Id.* at 70:4–5, 22. Later in his testimony, however, Officer Stratmann said that *the first time* he saw Defendant after he arrived Defendant told him that he was "not interested in talking." *Id.* 78:2–14. Despite the lack of clarity, Judge Smith determined that Defendant unambiguously invoked his right to silence. (Doc. # 95 at 19–21).

his car.  *Id.* 79:7–8.  Officer Stratmann got the Defendant up and began questioning him about whether he had ingested drugs and whether he felt ill.  *Id.* at 79:11–12, 80:3–5.  Once Officer Stratmann established that Defendant was safe, he left and continued working on the search warrants.  *Id.* at 80:11–14.

Officer Stratmann returned intermittently to check on Defendant and "carry[] on conversations with him about the progression [of] the case."  *Id.* at 82:5–6.  He told Defendant that police were drafting search warrants in his case and that his girlfriend had also been stopped by police.  *Id.* at 68:19–69:6.  During one of these check-ins, Officer Stratmann asked Defendant questions about the money that was found in the 2003 Cadillac CTS.  Officer Stratmann testified that he asked Defendant "'Is this your money,' kind of just administratively to figure out what the money was from."  *Id.* at 70:12–14.  He explained that "when you have that kind of money, [officers] have to put something on the paper [about] what we're doing with the money."  *Id.* 72:3–4.  He also asked Defendant whether he was working, in order to determine where the money came from.  *Id.* at 69:9–14.  Officer Stratmann did not say whether Defendant responded to the questions about the money; he also did not testify as to what time the interaction occurred.

Around 1:00 p.m.—approximately two and a half hours after Defendant said that he was not interested in talking—Defendant asked Officer Stratmann whether they could speak in a more private setting.  *Id.* at 81:24–82:2.  Officer Stratmann testified that he responded by telling Defendant that he "needed to be honest about what happened at the traffic stop."  *Id.* at 82:16–17.  At that point, Defendant asked for a cigarette and Officer Stratmann left to get cigarettes and a lighter.  *Id.* 82:23–25.  When Officer Stratmann returned, Defendant was taken to the Central Vice Unit of the Cincinnati Police

Department. (Doc. # 95 at 8). There, officers read Defendant his *Miranda* rights again, and Defendant signed a waiver. *Id.* Officer Baker then proceeded to conduct a recorded interview with Defendant. *Id.*

## II. PROCEDURAL BACKGROUND

On September 13, 2018, Defendant Davis was indicted by a federal grand jury. (Doc. # 7). The Indictment charged Defendant with one count of conspiracy to distribute and possess with intent to distribute controlled substances, one count of aiding and abetting in possession with intent to distribute 40 grams or more of a mixture of substance containing a detectable amount of fentanyl, and one count of aiding and abetting in possession with intent to distribute a mixture of substance containing a detectable amount of heroin. *Id.*

On March 27, 2019, Defendant filed a Motion to Suppress any and all evidence obtained as the result of the traffic stop on August 29, 2018 and the subsequent questioning. (Doc. # 67). After the United States filed its Response (Doc. # 80), Judge Smith held an evidentiary hearing. (Doc. # 85). Following the evidentiary hearing, the parties submitted supplemental briefing. (Docs. # 88 and 93). On August 9, 2019, Judge Smith filed an R&R (Doc. # 95), wherein she recommended that Defendant's Motion to Suppress (Doc. # 67) be denied. (Doc. # 95 at 29). On August 23, 2019, Defendant filed Objections to the R&R (Doc. # 99) to which the United States responded on September 9, 2019. (Doc. # 101). The Motion to Suppress (Doc. # 67) and R&R (Doc. # 95) are now ripe for review.

## III.   ANALYSIS

### A.   Standard of Review

Pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Criminal Procedure 59, a district court may refer a motion to suppress to a magistrate judge for the preparation of a report and recommendation.  "The magistrate judge must promptly conduct the required proceedings and enter on the record a recommendation for disposing of the matter, including any proposed findings of fact."  Fed. R. Crim. P. 59(b)(1).  If a party files timely objections to the recommendation, the district court must consider those objections de novo and "accept, reject, or modify the recommendation."  Fed. R. Crim. P. 59(b)(3).  Failure to object to a Magistrate Judge's findings or conclusions results in waiver of those objections.  Fed. R. Crim. P. 59(b)(2).

 "The filing of objections to a magistrate's report enables the district judge to focus attention on those issues—factual and legal—that are at the heart of the parties' dispute." *Thomas v. Arn*, 474 U.S. 140, 147 (1985).  Therefore, objections to a magistrate judge's R&R must be "specific."  Fed. R. Crim. P. 59(b)(2).  Vague, general, or conclusory objections are improper, will not be considered by the reviewing court, and are "tantamount to a complete failure to object."  *Cole v. Yukins*, 7 F. App'x 354, 356 (6th Cir. 2001); *see also Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995) ("[A] general objection to a magistrate's report, which fails to specify the issues of contention, does not satisfy the requirement that an objection be filed. The objections must be clear enough to enable the district court to discern those issues that are dispositive and contentious.").  Objections that merely state disagreements with the magistrate judge's conclusion or restate arguments previously presented to the magistrate judge are similarly improper.

*United States v. Bowers*, No. 0:06-cv-7-DLB-REW, 2017 WL 6606860, at *1 (E.D. Ky. Dec. 26, 2017); *United States v. Vanover*, No. 2:10-cr-14-DLB-REW, 2017 WL 1356328, at *1 (E.D. Ky. Apr. 11, 2017).

Defendant raises three objections to the R&R. (Doc. # 99). First, Defendant objects to Judge Smith's recommended finding that the officers had probable cause for the warrantless arrest of Defendant during the traffic stop on August 29, 2018. *Id.* at 2. Next, Defendant objects to Judge Smith's determination that Officer Stratmann's conversation with Defendant at the Warsaw Avenue police station was not an interrogation. *Id.* Finally, Defendant objects to Judge Smith's conclusion that the officers did not improperly influence Defendant to give statements after Defendant invoked his right to silence. *Id.* The Court will address each of Defendant's objections in turn.[3]

### B. The warrantless arrest of Defendant was supported by probable cause.

"The Fourth Amendment, which applies to the states through incorporation by the Fourteenth Amendment, protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Stricker v. Twp. of Cambridge*, 710 F.3d 350, 358 (6th Cir. 2013) (citing U.S. Const. amend. IV). A "warrantless arrest" is "reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). Thus, whether an arrest is "constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within

---

[3] Because neither party has objected to the R&R's findings that the stop of Defendant's vehicle was lawful and that Defendant invoked his right to silence, those portions of the R&R are **adopted**.

their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

The "probable-cause standard is a 'practical, nontechnical conception' that deals with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (quoting *Illinois v. Gates*, 426 U.S. 213, 231 (1983)). When determining probable cause, courts consider the events leading up to the arrest "from the standpoint of an objectively reasonable police officer." *Id.* at 371 (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). "While probable cause means that 'officers must show more than mere suspicion, the probable cause requirement does not require that they possess evidence sufficient to establish a prima facie case at trial, much less evidence sufficient to establish guilt beyond a reasonable doubt.'" *United States v. Romero*, 452 F.3d 610, 616 (6th Cir. 2006) (quoting *United States v. Strickland*, 144 F.3d 412, 416 (6th Cir. 1998)).

Here, Defendant raises two arguments in opposition to Judge Smith's conclusion that officers had probable cause to arrest him. (Doc. # 99 at 2–3). First, Defendant objects to Judge Smith's reliance on the testimony of Officer Broering to determine that there was probable cause. *Id.* at 2. Defendant claims that Officer Broering's testimony is not credible because it "was based off of information [Officer Broering] received from Officer Schaible," and that Judge Smith "essentially disregard[ed]" Officer Schaible's testimony. *Id.* Accordingly, Defendant asks that Officer Broering's testimony be disregarded as well. *Id.* Second, Defendant argues that the Statement of Facts prepared by Officer Broering makes it "clear that [Defendant] was arrested before the officers saw

the inside of his car, at which time they did not have probable cause for the immediate arrest." *Id.* at 3.

First, Judge Smith did not err in weighing the credibility of Officer Broering's testimony. When an objection challenges the magistrate judge's credibility determination, the district court has discretion to decide whether to rehear the evidence presented at the suppression hearing. *United States v. Raddatz*, 447 U.S. 667, 680–81 (1980). While the Court still reviews the magistrate's credibility determination de novo based on the evidentiary record, the Court is not required to conduct another evidentiary hearing. *Id.* at 674. If a reviewing court does not conduct a new hearing, then it should give the magistrate judge's findings great weight because only the magistrate judge observed "the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *United States v. Carmack*, 426 F. App'x 378, 380 (6th Cir. 2011) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985)); s*ee also Peveler v. United States*, 269 F.3d 693, 702 (6th Cir. 2001) (giving deference to the magistrate judge's credibility determination). "Credibility determinations of the magistrate judge who personally listened to the testimony of a witness should be accepted by a district judge unless [the district court] finds a reason to question the magistrate judge's assessment." *United States v. Johnson*, No. 10-cr-20176, 2011 WL 3844194, at *2 (W.D. Tenn. Aug. 30, 2011) (quoting *United States v. Robinson*, No. 1:07-cr-1, 2007 WL 2138635, at *1 (E.D. Tenn. July 23, 2007)).

As an initial matter, Defendant's argument is flawed because Judge Smith does not, as Defendant implies, make a credibility determination regarding Officer Schaible's testimony or say that his testimony should be disregarded. (Doc. # 95 at 14–15). Rather,

Judge Smith simply notes that "Defendant focuses on the testimony of Officer Schaible to support his argument" and that "the Government relies on the observations of all of the officers." *Id.* Additionally, Judge Smith does not rely solely on Officer Broering's testimony to support her probable cause finding. Instead, Judge Smith reviewed the "totality of circumstances" before concluding that there was probable cause to arrest Defendant without a warrant. (Doc. # 95 at 14–18). She repeatedly says that her finding is based on the observations of multiple officers and never singles Officer Schaible's testimony out as less credible. *See, e.g.*, *id.* at 18 ("[T]he observations of the officers both prior to and following search created probable cause to arrest [Defendant] at the scene of the stop."). Thus, Defendant mischaracterizes Judge Smith's findings.

Furthermore, there is no need for a new hearing to determine the credibility of Officer Broering's testimony because the record supports Judge Smith's finding that Officer Broering was credible. (Doc. # 95 at 17). Only a small portion of "Officer Broering's testimony was based off of information he received from Officer Schaible," as Defendant claims. (Doc. # 99 at 3). Other than testifying that Officer Schaible informed others that he could see Defendant manipulating something in the Cadillac's center console, the rest of Officer Broering's testimony was based on his personal knowledge and on information he received from other sources about the ongoing investigation into the Defendant. (Doc. # 87 at 41:14–61:15). Specifically, Officer Broering testified that as he approached Defendant's vehicle "it was apparent that [Defendant] was focusing" and that he "could see [the Defendant's] head was turned and looking down towards the center console area." *Id.* at 44:11–13. He explained that having participated in "thousands of traffic stops," he recognized the Defendant's actions as the "typical thing

that someone would do when they're trying to hide contraband." *Id.* at 44:20–22. Officer Broering also testified that he had "an unobstructed view into the car before [the Defendant] was ordered out." *Id.* at 58:11–13. He indicated that when he looked into Defendant's car, he saw orange juice poured into the center console and a "small plastic baggie consistent with how drugs would be packaged inside the orange juice in the cup holder." *Id.* at 45:22–24. Officer Broering also testified that he was aware that Defendant was the subject of a drug investigation. *Id.* at 51:9–10. Judge Smith based her credibility determination of Officer Broering on her observations at the evidentiary hearing, and the Court finds no reason to second-guess her assessment. *Cf. United States v. Gray*, 182 F. App'x. 408, 411 (6th Cir. 2006) (finding that a district court's credibility determination is generally not subject to reversal unless "implausible, internally inconsistent, or against the weight of evidence").

Defendant's second argument, that the officers arrested Defendant before they saw inside of the car, is also without merit. Defendant bases his objection on the Statement of Facts prepared by Officer Broering. Gov't Exhibit 10. The Statement of Facts says that "As [Defendant] was removed [from his car], a plastic baggie and white powder residue could be seen on the floor mat on the driver side." *Id.* Defendant claims that "[f]rom this report, it is clear that [Defendant] was arrested before the officers saw the inside of his car, at which time they did not have probable cause for the immediate arrest." (Doc. # 99 at 3).

Defendant is incorrect that the Statement of Facts proves that the officers could not see inside the car before Defendant was arrested. The Statement of Facts indicated that the officers could not see *the plastic baggie on the floor* until the Defendant was being

removed, not that officers could not see inside the car at all.  *See* Gov't Exhibit 10.  To the contrary, the Statement of Facts is quite clear that the officers could see into the car before Defendant was arrested.  The Statement describes how Officer "Clarkson could see a white power substance on [Defendant's] hands" and that Officer Broering "immediately noticed 2 empty orange juice bottles that [Defendant] had poured out into cup holders in the center console."  *Id.*  These statements demonstrate that officers could see into the car before Defendant's arrest and support the testimony given at the evidentiary hearing.  *See, e.g.*, (Doc. # 87 at 58:7–13) (Officer Broering testifying that he had an unobstructed view into the car before Defendant was removed).

The only piece of evidence the Statement of Facts alleges the officers did not see before Defendant was ordered out of the car is the plastic baggie of the floor.  Even assuming *arguendo* that the officers did not see the plastic baggie beforehand,[4] Judge Smith was still correct that there was probable cause to arrest Defendant based on the officers' other observations during the traffic stop and their knowledge of the ongoing drug investigation.  Probable cause may come from many sources, including a confidential informant's tip, when sufficiently detailed and corroborated by the independent investigation of law enforcement officers.  *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998).  The officers who arrested Defendant were aware that the day before Officer Kowalski had observed an alleged drug transaction involving the Defendant's vehicle and that Officer Kowalski's observations were corroborated by a reliable confidential informant.  (Doc. # 95 at 16).  Officers also testified that during the traffic stop

---

[4]     Officer Broering did not explicitly say during his testimony when he saw the baggie on the floor.  (Doc. # 87 at 45:22–46:1) (testifying that officers "could see at some point a baggie, small plastic baggie consistent with how drugs would be packaged inside the orange juice in the cup holder . . . [and] another baggie that had been discarded on the floor at the driver's feet").

they saw Defendant turn toward the center console of the car and look down, which is "a typical thing that someone would do when they're trying to hide contraband."  (Doc. # 87 at 44:9–13, 20–23).  Additionally, officers saw orange juice poured into the center console, a piece of a plastic baggie floating in the orange juice, and "a white powder substance on [Defendant's] hands."  Gov't Exhibit 10.  Considering all the facts and circumstances, there was sufficient evidence "to warrant a prudent man" in the officers' position to believe that Defendant "had committed or was committing an offense."  *Beck*, 379 U.S. at 91.  Accordingly, Judge Smith's finding that the officers had probable cause to arrest Defendant is hereby **adopted**.

### C.    Officer Stratmann's questioning was an interrogation.

Next, Defendant objects to Judge Smith's finding that Officer Stratmann did not interrogate Defendant.  (Doc. # 99 at 3–5).  Defendant argues that Officer Stratmann interrogated Defendant when Officer Stratmann questioned him about "how he got cash that was found in his car."  *Id.* at 4.  Defendant claims that this was a violation of his Fifth Amendment rights and that all subsequent statements he made after the alleged interrogation should be suppressed.  *Id.*

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  To protect this privilege, law-enforcement officers are required to inform a person of his right to remain silent before subjecting him to a custodial interrogation.  *Miranda v. Arizona*, 384 U.S. 436, 467–68 (1966).  "In practice, this places a burden upon state and federal officers to ensure that a suspect in custody is 'adequately and effectively apprised of his rights' and to honor those rights when exercised unless they have been waived."  *United States v. Saylor*, 705 F.

App'x 369, 372 (6th Cir. 2017) (quoting *Miranda*, 384 U.S. at 467).  Specifically, *Miranda* mandates the following procedural safeguards: "prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  *Miranda*, 384 U.S. at 444.  The defendant, however, "may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently."  *Id*.  Because the "warning of rights and their subsequent waiver are both 'prerequisites to the admissibility of any statement made by a defendant,' the failure of law-enforcement officers to adequately warn a suspect in custody of his constitutional rights is fatal to the admission of any testimony induced by subsequent police interrogation."  *Saylor*, 705 F. App'x at 372 (quoting *Miranda*, 384 U.S. at 476).  To put it simply, statements made in violation of *Miranda* must be suppressed.  *Id.*

The *Miranda* protections only attach when a defendant is subject to custodial interrogation.  In *Rhode Island v. Innis*, the Supreme Court defined "interrogation" for purposes of *Miranda* as not only "express questioning, but also . . . any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response."  *Innis*, 446 U.S. 291, 301 (1980).  An incriminating response includes "any response—whether inculpatory or exculpatory—that the prosecution may seek to introduce at trial."  *Id.* at 301 n.5.  Whether an interrogation has occurred is a fact-bound inquiry.  *United States v. Thomas*, 381 F. App'x 495, 501–02 (6th Cir. 2010).  "Even a relatively innocuous series of questions may, in light of the factual circumstances and the susceptibility of a particular suspect, be reasonably likely to elicit an incriminating response."  *Id.*  "If a reasonable

person, using all of the facts and circumstances available, would view the police as attempting to obtain a response to use at trial, it is an 'interrogation.'" *Bachynski v. Stewart*, 813 F.3d 241, 246 (6th Cir. 2015).

Here, while Officer Stratmann only asked a few questions, he still interrogated Defendant. Officer Stratmann acknowledged that he asked Defendant at least one express question: "Is this your money?" referring to the money that was found in Defendant's vehicle. (Doc. # 87 at 70:12–14). Officer Stratmann admitted that he asked the question in order "to figure out what the money was from." *Id.* 70:13–14. Officer Stratmann should have known that asking a person arrested on drug charges whether a large sum of money discovered during the investigation belonged to him was "reasonably likely to elicit an incriminating response" that "the prosecution may [have sought] to introduce at trial." *Innis*, 446 U.S. at 301. Other courts that have considered similar factual scenarios agree that even a few direct questions can constitute an interrogation.[5] *See United States v. Ray*, 690 F. App'x 366, 372 (6th Cir. 2017) (holding that asking "whose guns are these?" and "have you ever been to jail before" was an interrogation); *United States v. Martinez*, 462 F.3d 903, 909 (8th Cir. 2006) (holding that asking a defendant where he got the large amount of money found on his person was an

---

[5] *United States v. Thomas*, which the magistrate judge relies upon, is not applicable. 381 F. App'x 495 (6th Cir. 2010). In *Thomas*, the Sixth Circuit found that *Miranda* did not apply because the defendant was neither in custody nor subject to interrogation. *Id.* at 500. The court explained that the "one brief question" about who owned a firearm found in the car was "merely investigatory." *Id.* The court emphasized that the "questioning was neither hostile nor coercive" and "took place outside, in a public space, with several onlookers passing by." *Id.* The court went so far as to describe the interaction as a "pleasant discussion." *Id.* The encounter between Defendant and Officer Stratmann cannot be described as a pleasant discussion. Officer Stratmann asked Defendant about the money while Defendant was sitting handcuffed in the police station and had already invoked his right to silence. When "determining whether a defendant has been interrogated, a court should 'carefully scrutinize the factual setting of each encounter.'" *Id.* at 501–02 (quoting *Avery*, 717 F.2d at 1025). The factual setting in this case is distinct from *Thomas*.

interrogation); *United States v. Brown*, Crim. No. 06-148(01), 2006 WL 2314057 at * 12 (D. Minn. Aug. 9, 2006) (holding that asking a defendant where he got the cocaine found in his vehicle was an interrogation); *United States v. Gonzalez-DeLeon*, 32 F. Supp.2d 295, 928 (W.D. Tex. 1998) (holding that asking "Are these your documents?" and "Where did you get the visa?" was an interrogation).

Officer Stratmann's claim that his questions about the money were "just administrative[] to figure out what the money was from" is unpersuasive. (Doc. # 87 at 70:13–14). As the Supreme Court explained in *Innis*, interrogation does not include express questions "normally attendant to arrest and custody." *Innis*, 446 U.S. at 301. This exclusion, often called the "booking exception," is a limited one reserved for "questions 'reasonably related to the police's administrative concerns,' such as the defendant's name, address, height, weight, eye color, date of birth and current address." *United States v. Pacheco-Lopez*, 531 F.3d 420, 423 (6th Cir. 2008) (quoting *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990)). Questions that fall within the booking exception do "not relate, even tangentially, to criminal activity." *Avery*, 717 F.2d at 1024. Officer Stratmann's questions about who owned the money are more than tangentially related to the allegedly criminal activity, drug tampering and distribution, for which Defendant was arrested. Accordingly, the booking exception does not apply.

While Officer Stratmann's questioning was limited, "even this brief and cursory exchange amounted to a custodial interrogation." *Ray*, 690 F. App'x at 372. Because Officer Stratmann asked Defendant about the money after Defendant invoked his right to silence and before Defendant voluntarily reinitiated conversation with police, any responses Defendant gave are inadmissible. *See Miranda*, 384 U.S. at 476. The Court's

finding of an interrogation, however, is limited to the express questions about the money. The rest of Officer Stratmann's interactions with Defendant, including the updates he gave Defendant about his case, was not an interrogation. *Cf. Bachynski*, 813 F.3d at 246 ("[P]olice remain free to converse with the suspect about 'routine incidents of the custodial relationship.'" (quoting *Bradshaw*, 462 U.S. at 1045)). Accordingly, Judge Smith's determination that Officer Stratmann did not interrogate Defendant is **overruled** with respect to the Officer Stratmann's questions about the money found in Defendant's vehicle and any response Defendant gave to those specific questions is **suppressed.**

### D. Officers did not influence Defendant to initiate conversation about the case.

Although the Court agrees with Defendant that Officer Stratmann's questioning about the money was an interrogation, it does not follow that, as Defendant claims, all of Defendant's subsequent statements must be suppressed. Defendant argues that Officer Stratmann improperly influenced him to initiate a conversation with police by asking him about the money, showing him a picture of co-defendant Teets,[6] and giving him updates about his case. (Doc. # 99 at 5–6). Because of this alleged improper influence, Defendant objects to the admission of every statement he made after arriving at the Warsaw Avenue police station, including the recorded statement he gave at the Central

---

[6] Defendant claims that Officer Stratmann showed him the picture of Teets after Defendant invoked his right to silence. (Doc. # 99 at 5). If Defendant is correct, then this question would also be an interrogation and would support Defendant's argument that officers improperly influenced him. While the evidentiary hearing testimony is somewhat unclear on the timeline of events, *see supra*, there is enough evidence in the record to support Judge Smith's finding that Defendant was shown a picture of Teets before he invoked his right to silence. (Doc. # 95 at 25); (Doc. # 87 at 70:15–18). Officers may interrogate a person who has been read his *Miranda* rights and has not invoked his right to counsel or silence. *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010). Thus, the Court will not consider the questions Officer Stratmann asked about Teets when evaluating whether officers improperly influenced Defendant.

Vice Unit. *Id.* Judge Smith found that the officers did not improperly influence Defendant, so Defendant's recorded statement should not be suppressed. (Doc. # 95 at 25–29). Judge Smith's determination, however, is based primarily on her finding the Officer Stratmann did not interrogate Defendant. (Doc. # 95 at 25–29). While the Court found Officer Stratmann's questions to be an interrogation, the Court agrees with Judge Smith's finding that officers did not improperly influence Defendant and that Defendant's recorded statement should not be suppressed.

"[S]uspects who invoke their *Miranda* rights remain free to change their minds." *Bachynski v. Stewart*, 813 F.3d 241, 246 (6th Cir. 2015). In *Michigan v. Mosley*, the Supreme Court held that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" 423 U.S. 96, 104 (1975) (quoting *Miranda*, 384 U.S. at 474, 479). "The purpose of *Mosley*'s 'scrupulously honored' requirement is to safeguard against 'repeated rounds of questioning' that can serve to 'undermine the will of the person being questioned.'" *Davie v. Mitchell*, 547 F.3d 297, 308 (6th Cir. 2008) (quoting *Mosley*, 423 U.S. at 102). "The police violate *Mosley*'s admonition where they 'fail[ ] to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind.'" *United States v. Howton*, 260 F. App'x 813, 818 (6th Cir. 2008) (alteration in original) (quoting *Mosley*, 423 U.S. at 105–06).

*Mosley*, however, does not prevent the police from ever interrogating the defendant after he has invoked his right to silence. Instead, courts consider several

factors to determine whether the police scrupulously honored the defendant's invocation, such as "(1) whether police advised the defendant of his *Miranda* rights at the first interrogation, (2) whether police immediately ceased the interrogation upon defendant's request, (3) whether police resumed questioning after a significant period of time, and (4) whether police provided new *Miranda* warnings at the successive interviews." *Davie*, 547 F.3d at 310. If the defendant indicates a "willingness to discuss the investigation without influence by authorities," then subsequent statements may be admitted if the defendant "knowingly and intelligently waived his rights to counsel and silence." *Id*. at 304–05.

Here, the officers did not attempt to wear down Defendant's resistance or make him change his mind about refusing to talk. Rather, Defendant initiated conversation with the police himself without undue influence. While *Davie* was not designed to be a strict four-step test, 547 F.3d at 310, the *Davie* factors serve as starting point for the Court's analysis. The first two *Davie* factors support the Court's finding that Defendant was not improperly influenced. First, officers advised Defendant of his *Miranda* rights shortly after Defendant arrived at the police station, before Officer Stratmann asked Defendant about the money. (Doc. # 87 at 70:8–11). Second, once Defendant invoked his right to silence, officers immediately ceased any interrogation. *Id*. at 78:14–19. The Court cannot make a definitive conclusion on the third factor because it is unclear exactly how much time elapsed between Defendant invoking his right to silence and Officer Stratmann interrogating Defendant about the money.[7] This brief interrogation happened at some point during the two and a half hours between Defendant telling Officer Stratmann that he was not interested in talking and Defendant asking to speak in a more private setting. *Id*.

---

[7] Officer Stratmann did not testify to as what time he asked Defendant about the money found in the Cadillac.

at 81:19–82:2.  The fourth factor is also inconclusive.  While Officer Stratmann did not provide fresh *Miranda* warnings before asking about the money, Officer Baker did read Defendant his *Miranda* rights again prior to interviewing him at the Central Vice Unit.  *Id.* at 83:18–22.  Thus, the factors weigh against Defendant's position.

The only evidence in favor of Defendant's position is the fact that Officer Stratmann reinitiated interrogation when he asked Defendant about the money found in the Cadillac. This short interrogation, however, does not require the Court to suppress Defendant's recorded statement.  "The fact that officers question a defendant . . . after he had invoked his right to remain silent is not in and of itself sufficient to suppress a statement . . . if the circumstances of the interrogations involved no threats or coercion and the defendant's right to remain silent was scrupulously honored."  *United States v. Neal*, 780 F.2d 1023, 1985 WL 13922 at * 3 (6th Cir. 1985) (per curiam) (unpublished table opinion).  Officer Stratmann's questions may have been reasonably likely to elicit an incriminating response, but they were not coercive or designed to wear down Defendant's resolve. Instead, Officer Stratmann believed, albeit incorrectly, that the questions were necessary to complete the administrative booking procedure.  (Doc. # 87 at 70:12–14).

When viewed in context of the entire time period between Defendant invoking his right to silence and asking to speak in a more private setting, the questions about the money do not negate the finding that the police scrupulously honored Defendant's right to remain silent.  Immediately after Defendant invoked his right to silence, Officer Stratmann left him alone for a half hour.  *Id.* at 78:14–22.  Officer Stratmann only reinitiated contact with Defendant when he was concerned that Defendant may be overdosing.  *Id.* at 79:1–25.  After establishing that Defendant was safe, Officer Stratmann

again left Defendant alone and resumed working on search warrants.  *Id.* at 80:8–10.  He returned to Defendant intermittently to update him on the case and to continue checking on his well-being.  *Id.* at 82:3–13.  The only portion of this exchange that was improper was the questions about the money.  *Miranda* does not prohibit the police from updating a person in custody about the status of his case.  *Bachynski*, 813 F.3d at 246.  Critically, Defendant did not ask to speak in a more private setting in response to Officer Stratmann's questions about the money.  (Doc. # 87 at 80:21–81:5).  Officer Stratmann testified that Defendant asked to speak in a more private setting "as things were finally wrapping up at the different locations."  *Id.* at 81:1–2.  There is no evidence that Defendant's request to speak in a more private setting was a result of officers' attempt to wear down his resolve.  Instead, it appears that Defendant changed his mind and reinitiated a further conversation himself.

Furthermore, Defendant's subsequent waiver of his *Miranda* rights at Central Vice Unit was knowing and voluntary.  A defendant waives his right to silence when "the purported waiver was knowing and intelligent" based on the "totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities".  *Edwards v. Arizona*, 451 U.S. 477, 486 n9 (1981).  "The government bears the burden of proving, by a preponderance of the evidence, that the defendant's waiver of his *Miranda* rights was knowing and voluntary."  *United States v. Jones*, 205 F. App'x 327, 334 (6th Cir. 2006).  A valid waiver is "the product of a free and deliberate choice rather than intimidation, coercion, or deception" and is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

As Judge Smith describes, "there is nothing in the record which suggests that Defendant's decision to sign the written waiver [at Central Vice Unit] was not voluntary." (Doc. # 95 at 28).  After Defendant asked to talk in a more private setting, Defendant was taken from the police station on Warsaw Avenue to the Central Vice Unit.  (Doc. # 87 at 82:14–83:6).  When Defendant arrived, Officer Baker, who had not been involved in the previous investigation, conducted the interview.  *Id.* at 63:11–23.  Officer Baker read Defendant his *Miranda* rights prior to the interview, and Defendant signed a written acknowledgement of his rights.  *Id.* at 64:12–13; Gov't Exhibit 7.  Officer Baker also confirmed with Defendant that he had the ability to read and write.  (Doc. # 95 at 28).  Only after Defendant had signed a written waiver did Office Baker begin to ask him about the alleged criminal activity.  (Doc. # 87at 64:5–8).  At no time did Defendant invoke his *Miranda* rights again during the interview.  *Id.* at 65:7–9.  From these facts it appears that Defendant's choice was not the result of coercion and that he was aware of the rights he was giving up.  Thus, the Court agrees with Judge Smith's determination that Defendant's waiver at Central Booking Unit was voluntary.

Ultimately, the one or two questions that Officer Stratmann asked Defendant about the money found in his vehicle is not enough to find either that the police improperly influenced Defendant's decision to talk in a more private setting or his waiver of his *Miranda* rights at the Central Vice Unit.  When viewed in context of all the facts and circumstances, Defendant's waiver was knowing, voluntary, and intelligent.  Accordingly, Defendant's recorded statements were not the product of a *Miranda* violation.  Judge Smith's finding that Defendant's recorded statement should not be suppressed is **adopted**.

## IV. CONCLUSION

According, for the reasons stated herein,

**IT IS ORDERED** as follows:

(1)     The Magistrate Judge's Report and Recommendation (Doc. # 95) is hereby **adopted in part and rejected in part**;

(2)     Defendant Davis's Objections (Doc. # 99) to the R&R are **overruled in part and sustained in part**;

(3)     Defendant Davis's Motion to Suppress (Doc. # 67) is **denied in part and granted in part**;

(4)     The time period from March 27, 2019 through today's date, totaling 194 days, is **excluded** from the provisions of the Speedy Trial Act, pursuant to 18 U.S.C. §§ 3161(h)(1)(D)&(H); and

(5)     This matter is scheduled for a **Status Conference** on **Wednesday, October 9, 2019 at 2:00 p.m. in Covington**.

This 7th day of October, 2019.



Signed By:

*David L. Bunning*   DB

United States District Judge

K:\DATA\ORDERS\Covington Criminal\2018\18-37 Order adopting MTS R&R.docx